UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

Case No. 08-60996-CIV-COHN/SELTZER

FLEXITEEK AMERICAS, INC.,
et al.,

       Plaintiffs,

v.

PLASTEAK, INC., et al.,

       Defendants.

_____/

## FINDINGS OF FACT AND CONCLUSIONS OF LAW RE: DEFENDANTS' AFFIRMATIVE DEFENSE OF INEQUITABLE CONDUCT

**THIS CAUSE** is before the Court on the bench trial held on June 19, 2009

regarding Defendants' affirmative defense of inequitable conduct. On June 26, 2009,

the parties filed Proposed Findings of Fact and Conclusions of Law. (See DE 151, filed

by Defendants, and DE 153, filed by Plaintiffs.)[1] The Court has considered the

evidence presented at the bench trial, the parties' Proposed Findings of Fact and

Conclusions of Law, the record in this case, the argument of counsel, and is otherwise

advised in the premises. The Court finds that Defendants did not establish inequitable

conduct by clear and convincing evidence. Pursuant to the requirements of Rule 52 of

the Federal Rules of Civil Procedure, the Court issues the following Findings of Fact

and Conclusions of Law.

---

[1]     Attached as Exhibit A to Defendants' Proposed Findings of Fact and Conclusions of Law is an excerpted transcript of the June 19, 2009 bench trial [DE 151-2].

## I. BACKGROUND

On June 30, 2008, Plaintiffs filed a Complaint for Damages and Injunctive Relief [DE 1] alleging that Defendants sold or installed products that infringe on US Patent No. 6,895,881 ("the '881 patent"). The subject matter of the '881 patent is a synthetic teak decking product that is often used with marine vessels. On September 9, 2008, Defendants filed an Answer [DE 8] to the Complaint and asserted, *inter alia*, the affirmative defense of unenforceability due to inequitable conduct. Defendants moved the Court for summary judgment on the affirmative defense of unenforceability [DE 49] on April 10, 2009. That motion was denied at a hearing held on June 4, 2009. On June 5, 2009, in the Court's Order Granting in Part and Denying in Part Plaintiffs' Motion for Summary Judgment [DE 112], the Court informed the parties that the Court would conduct a bench trial on the issue of inequitable conduct. On June 14, 2009, Defendants filed a Motion to Reconsider, Alter or Amend Order Granting in Part and Denying in Part Plaintiffs' Motion for Summary Judgment [DE 124]. On June 16, 2009, the Court held a hearing on Defendants' Motion to Reconsider, Alter or Amend and denied the motion. The Court's Order Denying Defendants' Motion to Reconsider, Alter or Amend [DE 152] was entered on June 26, 2009.

In their Proposed Findings of Fact and Conclusions of Law, Plaintiffs attempt to characterize the Court's holding with respect to the issues of anticipation and obviousness. (See, e.g., DE 153 ¶ 85.) To be clear, the Court held that summary judgment was proper on the issues of anticipation and obviousness because Plaintiffs supported their Motion for Summary Judgment with affirmative evidence and Defendants did not point to specific facts in the record to show that there were genuine

2

issues for trial. (DE 152 at 11.)  Further, the Court found that Defendants' failure to specifically identify prior art in support of their affirmative defenses violated Defendants' obligations under 35 U.S.C. § 282. (Id. at 14-15.)  In addition, the Court denied Defendants' Motion to Reconsider, Alter or Amend because of Defendants' repeated failures to explain the basis for, and identify evidence to support, their affirmative defenses.  (Id. at 11.)

The Court conducted a jury trial on Plaintiffs' claim of infringement on June 15-19, 2009.  Due to untimely disclosures, the Court capped Plaintiff's potential damages and denied Plaintiffs' request to instruct the jury on the doctrine of equivalents.  At the close of evidence, the jury returned a verdict finding that Defendants PlasTEAK, Inc.'s and PlasDECK, Inc.'s products literally infringe the sole claim contained in the '881.  In addition, the jury found that Plaintiffs should be awarded $79,632.00 in damages from Defendant PlasDECK, Inc. as a result of infringement by PlasDECK, Inc. and that no damages should be awarded to Plaintiffs from PlasTEAK, Inc.  The jury also found that with respect to Defendant Andre Batista, Plaintiffs failed to establish liability.  The bench trial on the issue of inequitable conduct followed the jury's determination of infringement.

## II. FINDINGS OF FACT

### A.   The Original Invention

1.   On June 24, 1999, Derek Gordon Whitaker filed a Great Britain patent application for a "Shape Conforming Surface." (DE 30-2.)

2.   On October 8, 1999, Whitaker filed another Great Britain patent application disclosing the subject matter as "Flexible Surface Covering." (DE 30-3.)

3.   On March 7, 2000, Flexiteek International AS ("Flexiteek International") and

Whitaker entered into an agreement whereby Whitaker assigned his rights to the Great Britain patent applications and the underlying invention to Flexiteek International. (See Ex. A to DE 30-5; see also Order Denying Defendants' Renewed Motion to Dismiss, DE 126.)

4.   In exchange, Whitaker received £250,000.00, royalty fees, a 10% share of stock in Flexiteek International and a 36-month employment contract as Manager of Research and Development with Flexiteek International. (Id.)

5.   On June 19, 2000, Flexiteek International converted the intellectual property acquired through the agreement, including the two Great Britain patent applications filed by Whitaker, into International Patent Application Number PCT/SE00/0132 ("PCT Application") for a "Shape Conforming Surface Covering." (DE 30-6.) The PCT Application claims priority to both of the Great Britain applications. (Id.)

6.   The PCT application designated states for the "national phase" of the application, including New Zealand and the United States. (Id.)

**B.   The New Zealand Patent**

7.   On September 12, 2001, Flexiteek International filed a New Zealand patent application for a "shape conforming surface covering," which claimed priority in the two Great Britain patent applications. (See DE 124-9 at 2.)

8.   A notice of acceptance of the New Zealand patent application issued on September 23, 2002. (Id.)

9.   In 2003, Flexiteek International filed a lawsuit against Tek-Dek NZ Limited ("Tek-Dek") for infringement of the New Zealand patent. (DE 59-4 ¶ 6.)

10.   In response to that suit, Tek-Dek filed an application for revocation of the New

4

Zealand patent with the Intellectual Property Office of New Zealand ("IPONZ") on

July 4, 2003.  (Id. ¶ 7.)

11.   The infringement action was settled in August 2004 with Tek-Dek "agreeing to a

destruction of all infringing products, an injunction from selling any further

infringing products in New Zealand, and payment of money damages and costs."

(Id. ¶ 8; see also DE 151-2 at 74:2-3.)

12.   Nevertheless, the revocation proceedings went forward.

13.   After filing a counterstatement in the revocation proceeding, Flexiteek

International declined to participate any further.  According to Svein

Abrahamsen, President and CEO of the company, Flexiteek International

"elected to abandon the New Zealand Patent" for the following reasons.

> First and foremost, the amount of business from sale of Flexiteek's
> synthetic teak decking products in New Zealand did not warrant the
> expense of contesting the pending application for revocation.  Secondly,
> since the New Zealand Patent was granted in September 23, 2002, there
> was a substantial change in the technology of synthetic teak decking
> products which made the claims in the New Zealand Patent outdated.
> (Id. ¶ 10.)

14.   Tek-Dek filed evidence in support of the application for revocation of the New

Zealand patent, while Flexiteek International did not file any evidence in defense

of the New Zealand patent.  (See DE 124-9.)

15.   On April 18, 2005, the IPONZ issued a decision revoking the New Zealand

patent.  (See DE 124-9.)  In particular, the IPONZ found "that grounds [of prior

publication, obviousness and not an invention] have been made out.  I do not

believe there is any basis for amendment to save any aspect of the claims as

accepted.  The patent is revoked."  (Id. at 32.)

16.   In support of these findings, the IPONZ decision cited to prior art which included,

among others, U.S. Patent 4,290,248 (Kemerer).  (Id. at 10-11.)

17.   The New Zealand patent contained eighteen claims, consisting of one

independent claim and seventeen dependent claims.

18.   The IPONZ decision stated that "[t]he main claim is claim 1.  The remaining

claims depend from this claim and do not, in my estimation, add any further

inventive feature to claim 1.  The fate of the remaining claims depends on my

finding against claim 1."  (Id. at 6.)

19.   Claim 1 of the New Zealand patent states:

A shape conforming surface covering useful for covering any type of
surfaces, wherein the surface covering comprises planks or sheet of
flexible material adapted to be interconnected aside of each other thereby
forming an assembled surface covering of optional length and width, and
which planks are of a material that can be laid in curved formations, and
which at the upper surface of the covering is roughened, for instance
sanded or filed so as to imitate any unique grain effect of wooden material.
(Id.)

## C.   The US Patent

20.   On December 18, 2001, Flexiteek International converted the PCT Application

into a US patent application with Whitaker named as the applicant.  (DE 30-11.)

21.   The United States Patent and Trademark Office ("PTO") did not accept the

patent application until August 5, 2003, after Flexiteek took several procedural

steps required as a result of Whitaker's lack of cooperation in the application

process.  (DE 30-20.)

22.   In a communication, dated June 1, 2004, the PTO rejected the US patent

application as filed.  (See DE 124-2.)  Specifically, the PTO found that "[c]laims

1-17 are rejected under 35 U.S.C. 112, second paragraph, as being indefinite for

failing to particularly point out and distinctly claim the subject matter which

applicant regards as the invention."  (Id. at 4.)  In addition, the PTO found that

"[c]laims 1-4, 6, 7, 8, 16 and 17 are rejected under 35 U.S.C. 103(a) as being unpatentable over Zwilgmeyer in view of Anstadt." (Id. at 5.) In discussing "obviousness," the patent examiner also cited the patents of Harshberger, Hinds et al., and Hunter et al. (Id. at 8.) The patent examiner also cited the Klammt patent "to show grooved flat bottoms." (Id.)

23. On September 1, 2004, Plaintiffs' patent counsel replied to the PTO and submitted an application including 26 claims with "amendments and remarks" in response to the communication discussed above. (See DE 46-3 at 36-56.)

24. In a communication, dated October 13, 2004, the PTO rejected claims 1-14 and 16-26 and allowed claim 15. (See DE 124-3.) Specifically, the PTO found that "[c]laims 14 and 20 are rejected under 35 U.S.C. 112, second paragraph, as being indefinite for failing to particularly point out and distinctly claim the subject matter which applicant regards as the invention." (Id. at 2.) In addition, the PTO rejected a number of claims as being anticipated under 35 U.S.C. § 102(b) or unpatentable under 35 U.S.C. § 103(a) in light of prior art. (See id. at 3-8.)

25. The PTO found that claim 15 was allowable, and this was the sole claim that was included in the '881 patent.

26. The sole claim embodied in the '881 patent is a combination of the subject matter of claim 1 of the original US application, which is identical with claim 1 of the New Zealand patent, with the limitation contained in claim 15 of the original US application that states: "further characterized in that the planks or sheet are formed with longitudinal slots at the underside thereof for facilitating forming of curved coverings and for acting as a base for a glue or adhesive material by means of which the surface covering is mounted on a surface recipient." (Exhibit

V to DE 52-4.)

27.   On November 22, 2004, the PTO issued a Notice of Allowability of claim 15 of

the US patent application.

28.   The '881 patent was issued on May 24, 2005, identifying the claim as follows:

A shape conforming surface covering useful for covering any type of
surfaces, characterized in that the surface covering comprises planks or
sheet of flexible material adapted to be interconnected aside of each other
thereby forming an assembled surface covering of optional length and
width, and which planks are of a material that can be laid in curved
formations, and which at the upper surface of the covering is roughened
so as to imitate any unique grain effect of wooden material, further
characterized in that the planks or sheet are formed with longitudinal slots
at the underside thereof for facilitating forming of curved coverings and for
acting as a base for a glue or adhesive material by means of which the
surface covering is mounted on a surface recipient. (Exhibit V to DE 52-
4.)

29.   Neither the existence of revocation proceedings concerning the New Zealand

patent nor the IPONZ decision were disclosed to the PTO during the prosecution

of the US patent application.

**D.   Inequitable Conduct**

30.   Defendants' affirmative defense that the '881 patent is unenforceable is based

on the fact that Plaintiffs did not disclose the IPONZ decision and the prior art

contained therein to the PTO during the prosecution of the US patent application.

31.   At the bench trial, the Court admitted into evidence documents filed with IPONZ

in connection with the revocation proceedings and the IPONZ decision dated

April 18, 2005.

32.   In addition, the Court received the testimony of Svein Abrahamsen, the

President and CEO of Flexiteek, and his prior Declaration was admitted into

evidence.

33.   In his Declaration, Mr. Abrahamsen stated that "[o]ne of his duties . . . is to

monitor the acquisition of intellectual property on behalf of the company and to monitor and supervise the patent process in countries in which [Plaintiffs] sell their products."  (DE 59-4 ¶ 3.)

34. Mr. Abrahamsen testified that he relied heavily on the advice of Flexiteek International's patent counsel in regards to the company's patent interests. (See, e.g., DE 151-2 at 49:5-6 ("we relied on these patent lawyers to know what was needed to do the proper job"); id. at 70: 21-24 ("in house we did not have any patent competence, so we relied heavily on [Flexiteek's Swedish patent counsel] for expertise, advice, and for processing").)

35. Mr. Abrahamsen testified that Flexiteek International prosecuted its patent interests in other countries, including the United States and New Zealand through legal counsel specializing in the patent laws of those countries. (Id. at 70:1-7.)

36. Mr. Abrahamsen testified that he relied on Flexiteek International's Swedish patent counsel Ehrner & Delmar Patenbrya, AB to coordinate and manage Flexiteek International's regional patent counsel in countries such as the United States and New Zealand. (Id. at 46:4-7 ("We have a coordinating patent office in Sweden called [Ehrner & Delmar] who have coordinated all the global patent activities with us and working with lawyers in the different countries.").)

37. The Defendants did not seek the deposition or attempt to procure the testimony of any individual from Flexiteek International's Swedish patent counsel Ehrner & Delmar Patenbrya, AB.

38. The Defendants did not seek the deposition or attempt to procure the testimony of Michael Mutter of the law firm Birch, Stewart, Kolasch & Birch, LLP, who, based on the records submitted into evidence, acted as patent counsel for

Flexiteek International in connection with the prosecution of the US patent application before the PTO.

39.   The Defendants did not seek the deposition or attempt to procure the testimony of any individual from the law firm of Baldwin Shelton Waters.  Based on the records submitted into evidence, all documents filed in connection with the IPONZ proceedings were served on Baldwin Shelton Waters on behalf of Flexiteek International.

40.   The Defendants did not introduce any written communications or documents from Flexiteek International's patent counsel.

41.   Mr. Abrahamsen testified that he does not recall reviewing the IPONZ decision.

42.   Mr. Abrahamsen testified that he was not specifically aware of any of the prior art discussed in the IPONZ decision.

43.   Mr. Abrahamsen testified that he relied on advice from Flexiteek International's Swedish patent counsel Ehrner & Delmar Patenbrya, AB regarding all decisions made with respect to the IPONZ proceedings.  (See, e.g., DE 151-2 at 49:1-6.)

44.   In his Declaration, Abrahamsen states that he "received advice of counsel that any prior art that appeared or was referenced by the IPONZ decision was 'redundant' of the prior art that had either been disclosed during the course of the [US patent application] or discovered by the [PTO]."  (DE 59-4 ¶ 22.)

45.   Mr. Abrahamsen testified that it was his impression that the technology embodied in the '881 patent "has improved over the years and it is different." (DE 151-2 at 69:5.)

## III. CONCLUSIONS OF LAW

### 1.  Inequitable Conduct

To establish the existence of inequitable conduct in a patent case, a party must present "evidence of affirmative misrepresentation of a material fact, failure to disclose material information, or submission of false material information, coupled with an intent to deceive." Ulead Systems, Inc. v. Lex Computer & Management Corp., 351 F.3d 1139, 1144 (Fed. Cir. 2003). Thus, a claim of inequitable conduct has two elements of materiality and intent – both of which must be established by clear and convincing evidence. Bruno Indep. Living Aids, Inc. v. Acorn Mobility Servs., Ltd., 394 F.3d 1348, 1351 (Fed. Cir. 2005). If a defendant succeeds in proving materiality and intent to deceive, the Court must weigh these findings in light of all of the circumstances and determine if there was inequitable conduct. See Purdue Pharma L.P. v. Boehringer Ingelheim GmbH, 237 F.3d 1359, 1366 (Fed. Cir. 2001). "This requires a careful balancing: when the misrepresentation or withheld information is highly material, a lesser quantum of proof is needed to establish the requisite intent. In contrast, the less material the information, the greater the proof must be." Purdue Pharma L.P. v. Endo Pharms. Inc., 438 F.3d 1123, 1128-29 (Fed. Cir. 2006)

The materiality of a prior art product turns on whether "a reasonable examiner would consider it important in deciding whether to allow the application to issue as a patent." Symantec Corp. v. Computer Assocs. Int'l, Inc., 522 F.3d 1279, 1297 (Fed. Cir. 2008) (quotation omitted). In 1992, 37 C.F.R. § 1.56, which articulates the materiality standard, was revised to read, in pertinent part:

> information is material to patentability when it is not cumulative of information already of record or being made of record in the application, and
>
>> (1) It establishes, by itself or in combination with other information, a prima facie case of unpatentability of a claim; or

11

>        (2) It refutes, or is inconsistent with, a position the applicant takes
>        in: (i) opposing an argument of unpatentability relied on by the
>        Office, or (ii) asserting an argument of patentability.

37 C.F.R. § 1.56(b) (2008).

Intent need not be proven by direct evidence. <u>ATD Corp. v. Lydall, Inc.</u>, 159 F.3d 534, 547 (Fed. Cir. 1998). Rather, in the absence of a credible explanation, "intent to deceive is generally inferred from the facts and circumstances surrounding a knowing failure to disclose material information." <u>Id.</u>; <u>see also</u> <u>Cargill, Inc. v. Canbra Foods, Ltd.</u>, 476 F.3d 1359, 1364 (Fed. Cir. 2007) ("Intent rarely can be, and need not be, proven by direct evidence . . . . Instead, an intent to deceive is usually inferred from the facts and circumstances surrounding the conduct at issue.") "To satisfy the requirement of . . . intent to deceive . . . , the involved conduct, viewed in light of all the evidence, including evidence of good faith, must indicate sufficient culpability to require a finding of intent to deceive." <u>M. Eagles Tool Warehouse, Inc. v. Fisher Tooling Co., Inc.</u>, 439 F.3d 1335, 1341 (Fed. Cir. 2006) (quotation omitted).

A good faith explanation can be presented as evidence to refute an inference of intent. <u>Id.</u> On the other hand, while the absence of a good faith explanation can constitute evidence to support a finding of intent, "that evidence alone does not constitute clear and convincing evidence warranting an inference of intent." <u>Id.</u> In <u>Kingsdown Medical Consultants, Ltd. v. Hollister Inc.</u>, 863 F.2d 867 (Fed. Cir. 1988), the Federal Circuit explained that "a finding that particular conduct amounts to 'gross negligence' does not of itself justify an inference of intent to deceive; the involved conduct, viewed in light of all the evidence, including evidence indicative of good faith, must indicate sufficient culpability to require a finding of intent to deceive." <u>Id.</u> at 876.

**2.    Defendants Fail to Meet Their Burden to Establish Inequitable Conduct by Clear and Convincing Evidence**

Based on the record in this case and the evidence admitted at the bench trial, the Court finds that Defendants have met their burden to establish that the IPONZ decision and the prior art referenced therein were material.  The inference that prior art or other information is material is strong where it has been used in rejecting the same or similar claims contained in a foreign patent.  See Gemveto Jewelry Co. v. Lambert Bros., Inc., 542 F. Supp. 933, 942 (S.D.N.Y. 1982).

However, the Plaintiffs put forth a good-faith explanation as to why such information was not disclosed to the PTO.  Mr. Abrahamsen testified that it was his impression that the technology embodied in the '881 patent "has improved over the years and it is different."  (DE 151-2 at 69:5.)  Mr. Abrahamsen also submitted a Declaration stating that he "received advice of counsel that any prior art that appeared or was referenced by the IPONZ decision was 'redundant' of the prior art that had either been disclosed during the course of the [US patent application process] or discovered by the patent examiner."  (DE 59-4 ¶ 22.)

Having weighed the testimony and other evidence presented, the Court finds Plaintiffs' good-faith explanation to be credible.  In particular, the Court finds it probative that the initial US patent application, which mirrored the New Zealand patent, was also rejected.  It was not until Plaintiffs' amended the US patent application that the PTO allowed a single, narrow claim to be embodied in the '881 patent.  Plaintiffs' good-faith explanation is also supported by the fact that Flexiteek International did not contest the revocation of the New Zealand patent.  In addition, "a finding that particular conduct amounts to 'gross negligence' does not of itself justify an inference of intent to deceive."  Kingsdown, 863 F.2d at 876.

Defendants' counsel pressed Mr. Abrahamsen on the statement in his Declaration that the prior art referenced in the IPONZ decision was redundant of the prior art before the PTO.  (See 151-2 61:8-64:6.)  Under questioning, Mr. Abrahamsen stated that this statement was not his own recollection, but rather the "recollection of the involved patent attorneys." (Id. at 63:14-15.)  The Court finds nothing surprising or untoward about the fact that Mr. Abrahamsen relied heavily on the advice of his patent lawyers.  The Court would expect that many CEO's would defer to counsel regarding technical matters such as intellectual property.  The Court also finds it significant that Defendants did not submit any testimony or written evidence from Flexiteek International's patent counsel that would undermine the Plaintiffs' good-faith explanation.

Ultimately, it is the burden of proof that is critical to the Court's determination.  If Defendants' burden was simply a preponderance of the evidence, this case would present a far more difficult question.  However, the Court concludes that Defendants have failed to meet their burden to demonstrate by clear and convincing evidence that Plaintiffs possessed an intent to deceive the PTO in connection with the '881 patent.[2]

---

[2]      In Defendants' Proposed Findings of Fact and Conclusions of Law, Defendants assert that the '881 patent is barred by 35 U.S.C. § 102(d) based on "filing date for the '881 patent of August 5, 2003." (DE 151 at 15.)  The Court rejects this argument.  First, as Defendants are aware, the US patent application was submitted years before and it took until August 5, 2003 to iron out the procedural issues regarding Mr. Whitaker's non-participation in the process.  Second, pursuant to 35 U.S.C. § 383, Flexiteek International may rely on the June 19, 2000 filing date of PCT Application, because the PCT Application designated the United States.  35 U.S.C. § 383 ("An international application designating the United States shall have the effect, from its international filing date under article 11 of the treaty, of a national application for patent regularly filed in the Patent and Trademark Office . . . .").  Finally, Defendants attempt to argue that Mr. Abrahamsen's testimony destroys the unity of the invention.  The Court finds that Abrahamsen's testimony that the invention embodied in the '881 patent was "improved" and "different" as compared to the New Zealand patent does not prevent the '881 patent from receiving the priority date of the PCT Application.

Accordingly, the Court finds that Defendants have not established that the '881 patent is unenforceable due to inequitable conduct.

**DONE AND ORDERED** in Chambers at Fort Lauderdale, Broward County, Florida, on this 3RD day of July, 2009.

James I. Cohn

**JAMES I. COHN**
**United States District Judge**

Copies provided to:

Counsel of record via CM/ECF

15